IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

DAVID WYNTER,

               Plaintiff,

      v.

G. RAMEY, *et al.,*

               Defendants.

_____

Civil Action No.
9:11-CV-0257 (DNH/DEP)

<u>APPEARANCES</u>:

<u>FOR PLAINTIFF</u>:

DAVID WYNTER, *Pro Se*
05-A-1750
Attica Correctional Facility
Box 149
Attica, NY 14011

<u>FOR DEFENDANTS</u>:

HON. ERIC T. SCHNEIDERMAN
New York State Attorney General
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>OF COUNSEL</u>:

CHARLES QUACKENBUSH, ESQ.
ROGER W. KINSEY, ESQ.
Assistant Attorneys General

<u>REPORT, RECOMMENDATION, and ORDER</u>

*Pro se* plaintiff David Wynter, a New York state prison inmate,

commenced this action against the Commissioner of the New York State

Department of Corrections and Community Supervision ("DOCCS") and

twenty-six other DOCCS employees, most though not all of whom were employed at the correctional facility in which he was confined at the relevant times, as well as seven additional John Doe defendants, pursuant to 42 U.S.C. § 1983, alleging that defendants have deprived him of his civil rights. The claims in this action arise out of a physical altercation between plaintiff and several corrections officers, and the events following the fight. In his complaint, plaintiff alleges, *inter alia*, that he was (1) subjected to the use of excessive force; (2) denied medical treatment for his resulting injuries; and (3) deprived of due process in the disciplinary hearing that resulted from the incident.

Currently pending before the court is a motion brought by several of the defendants requesting the entry of summary judgment dismissing plaintiff's remaining claims based on various grounds. For the reasons set forth below, I recommend dismissal of plaintiff's medical indifference and procedural due process claims, but conclude that the record now before the court reveals the existence of material disputes of fact with respect to plaintiff's excessive force claim that must be resolved before the claim can be adjudicated.

I.    BACKGROUND[1]

Plaintiff is a prison inmate currently being held in the custody of the

DOCCS.  *See generally* Complaint (Dkt. No. 1).  At the times relevant to this

action, plaintiff was confined to the Great Meadow Correctional Facility

("Great Meadow"), located in Comstock, New York.  *Id*.

On June 18, 2008, while at Great Meadow, plaintiff went to the facility

commissary to make purchases.  Quackenbush Exh. B (Dkt. No. 66-6) at 28-

29.  After exiting the area, and upon realizing that he had not received his

_____

[1]        Although plaintiff opposed defendants' motion for summary judgment, he did not file an opposition to defendants' rule 7.1(a)(3) statement of material facts that complies with rule 7.1 of the local rules of practice for this court.  Specifically, defendants filed an five-page statement of material facts that contains twenty-five paragraphs and complies with the citation requirements of rule 7.1(a)(3).  Defs.' L.R. 7.1(a)(3) Statement (Dkt. No. 66-2).  In response, plaintiff filed a twenty-two page document that, although is entitled "Statement of Facts," neither admits nor denies any of the statements contained in defendants' rule 7.1(a)(3) statement.  Dkt. No. 81-1.  That document appears to be plaintiff's memorandum of law in support of his opposition to defendant's motion, especially considering that there is no other document contained in his submission that is entitled or closely resembles a memorandum of law.
         Plaintiff was warned of the consequences of failing to properly respond to defendants' statement of material facts.  Dkt. No. 68-1.  The court therefore accepts defendants' facts to the extent that they are supported by accurate citations to the record.  *See* N.D.N.Y. L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." (emphasis in original)); *see also*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases and deeming all of the facts asserted in the defendant's statement of material facts as admitted where the plaintiff did not specifically admit or deny any of the assertions and "failed to contain a single citation to the record").  As to any facts not contained in defendants' rule 7.1 statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

allotment of toilet paper, he reentered the commissary, passing a "Do Not Enter" sign, and advised defendant John L. Gille, a corrections officer stationed at the facility, that he had returned for his toilet paper. *Id.* After defendant Gille ordered plaintiff to exit the area, Wynter went into the hallway but returned almost immediately, insisting that he be allowed to return to the commissary to retrieve his toilet paper. *Id.* After again being instructed by defendant Gille to return to the hallway, plaintiff pushed the officer in the chest. *Id.* Gille then returned force, punching plaintiff twice in the face, and was assisted by other corrections officers in restraining plaintiff. *Id.* In his complaint, plaintiff alleges that those other officers, including defendants R. Blood, Jason S. Nephew, and Colleen Russell, collectively wrestled him to the floor, restrained him, and administered a beating. Complaint (Dkt. No. 1) at ¶ 42. Plaintiff additionally alleges that defendant Deborah A. Cooney, a commissary sergeant, stood by and observed the attack, but failed to come to his aid. *Id.* ¶ 43.

Once restrained, plaintiff was escorted by security staff to the prison infirmary. Alden Decl. (Dkt. No. 66-3) at ¶ 7. Plaintiff's complaint alleges that, while being escorted to the infirmary, the corrections officers accompanying him, including defendants Christopher M. Bickford, T. Rocque,

4

Danny Porlier, and Sergeant Beebe, continued to assault him.  Complaint (Dkt. No. 1) at ¶ 56.   Notwithstanding this allegation, in his response in opposition to defendants' motion, plaintiff alleges only that he was further assaulted in the infirmary.  Plf.'s Resp. (Dkt. No. 81-1) at 2.  In contrast, defendant Susan Alden, a registered nurse employed at the facility, avers that no force was used against plaintiff at that time.  Alden Decl. (Dkt. No. 66-3) at ¶ 8.

Plaintiff contends that, as a result of the defendants' conduct, he suffered injuries to his head, ear, neck, eye, upper and lower back, left foot, jaw, lips, shoulder, wrists, nose, and left eye, and that since the attack, he has suffered from recurring migraine headaches, anxiety, upset stomach, numbness to his jaw, shoulder, foot, back, wrists, thighs, and head. Complaint (Dkt. No. 1) at ¶¶ 44, 45, 54; *see also* Plf.'s Resp. (Dkt. No. 81-1) at 6.  An examination by medical staff at the facility on the day of the incident revealed that plaintiff had sustained abrasions to his right scapula and to his right cheek, and that while his lips contained some blood, there were no observable lacerations in that area.  Alden Decl. (Dkt. No. 66-3) at ¶¶ 10-11; Quackenbush Decl. Exh. A (Dkt. No. 67) at 35, 78-79.  During the examination plaintiff voiced subjective complaints of pain in his ankles, jaw,

shoulders, and wrists. Quackenbush Decl. Exh. A (Dkt. No. 67) at 35.

On June 19, 2008, at the recommendation of defendant Fisher Nesmith, a physician's assistant stationed at Great Meadow, plaintiff was taken to an outside hospital to address his complaints of ankle pain. Quackenbush Decl. Exh. A (Dkt. No. 67) at 45. Upon examination, a physician at the hospital discerned some soft tissue swelling of the ankle, but no broken bones other than small fractures of indeterminate age in two dorsal foot bones. *Id.* The examining doctor explained that "[a]cute avulsion fractures cannot be ruled out in this patient with a history or recent trauma and clinical correlation is required." *Id.*

Plaintiff was issued a misbehavior report by defendant Gille on June 18, 2008, as a result of the incident at the Great Meadow commissary. Quackenbush Decl. Exh. D (Dkt. No. 66-10) at 62. A tier III disciplinary hearing was held by defendant G. Ramey, a deputy superintendent at the facility, to address the charges lodged against the plaintiff.[2] Quackenbush

---

[2] The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties that include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

Decl. Exh. B (Dkt. No. 66-6). Plaintiff was provided with advance written notice of the disciplinary charges prior to the hearing, and at the hearing, he was provided an opportunity to call witnesses and present documentary evidence in his defense, and a written statement of evidence relied on by the hearing officer in making his determination. *Id.* at 2. On July 3, 2008, at the conclusion of the hearing, plaintiff was found guilty of violating several prison rules, including creating a disturbance, assault on staff, interference with an employee, and refusing a direct order. *Id.* at 30. Based upon his findings, defendant Ramey sentenced plaintiff to a period of six months of SHU confinement, with a concurrent loss of package, commissary, and telephone privileges, and additionally recommended that he forfeit six months of good time credits. *Id.* Defendant Norman. R. Bezio, the DOCCS Director of Special Housing/Inmate Disciplinary Program, upheld defendant Ramey's disposition and sentence upon appeal by plaintiff. Quackenbush Exh. E (Dkt. No. 66-15) at 19.

II.     PROCEDURAL HISTORY

Plaintiff commenced this action on March 9, 2011. Dkt. No. 1. Upon review of plaintiff's complaint and accompanying application to proceed *in forma pauperis*, Dkt. No. 2, pursuant to 28 U.S.C. §§ 1915(e), District Judge

David N. Hurd determined that the complaint alleged sufficient facts to plausibly allege certain causes of action, including (1) an excessive force claim against defendants Gille, Blood, Nephew, Cooney,[3] Bickford, Rocque, Porlier and Bebee; (2) a deliberate medical indifference claim against defendants Alden, Znipp, Dunning, Nesmith, as well as two nurses identified as "John Doe," medical providers at Great Meadow; and (3) a due process claim against defendants Ramey and Bezio, challenging the disciplinary sanctions imposed as a result of the tier III hearing, provided that the plaintiff agreed to waive his right to challenge the duration of his confinement based on that hearing.  Dkt. No. 8.  That decision directed the dismissal of all other claims contained in plaintiff's complaint, with leave to replead.[4]  *Id.* at 22-23. On October 25, 2011, plaintiff submitted his waiver in accordance with the court's instructions and *Peralta v. Vasquez*, 467 F.3d 98 (2d Cir. 2006).  Dkt. No. 13.  Judge Hurd accepted plaintiff's *Peralta* waiver in a subsequent decision and order, in which he also dismissed plaintiff's due process claim against defendants Ramey and Bezio to the extent that it challenged

---

[3]     Defendant Cooney's culpability hinges on a failure-to-protect theory of liability as it relates to the the the allegedly unconstitutional use of force against plaintiff by defendants Gille, Blood, Nephew, and Russell.  Complaint (Dkt. No. 1) at ¶ 50.

[4]     Despite receiving leave to do so, plaintiff has not filed an amended complaint in the action.  *See generally* Docket Sheet.

disciplinary sanctions affecting the duration of his confinement.  Dkt. No. 14.

On October 12, 2012, defendants Gille, Blood, Nephew, Russell, Cooney, Bickford, Rocque, Porlier, Beebe, Alden, Nesmith, Ramey, and Bezio moved for the entry of summary judgment dismissing plaintiff's complaint.  Dkt. No. 66.  In their motion, defendants argue that (1) plaintiff's excessive force cause of action is foreclosed, based upon an adverse determination in plaintiff's disciplinary hearing at Great Meadow, and additionally because the available medical evidence does not support his allegations related to the injuries resulting from the assault; (2) the record fails to support the objective and subjective elements of a medical indifference claim; (3) the record fails to disclose any basis to conclude that plaintiff was denied due process during the course of his disciplinary hearing; (4) to the extent that plaintiff complains of the conditions of his disciplinary confinement in the facility special housing unit ("SHU"), that claim lacks merit, and plaintiff is precluded from pursuing it because he failed to exhaust administrative remedies with respect to it; and (5) defendants are entitled to qualified immunity from suit.  Dkt. No. 66-1.   Plaintiff has since responded in opposition to defendants' motion.  Dkt. Nos. 81, 82.

Defendants' summary judgment motion, which is now fully briefed, has

been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

   A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of

demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.    Plaintiff's Excessive Force Claim

1.    Governing Legal Standard

Plaintiff's excessive force claim is grounded in the Eighth Amendment, which prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or 'involve[s] the unnecessary and wanton infliction of pain[.]'" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (citations omitted)).  While the Eighth Amendment "'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319 (quotation marks omitted); *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir. 1999).  "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components – one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson,* 503 U.S. at 7-8; *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d

Cir. 1999)).  To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct."  *Wright*, 554 F.3d at 268 (quotation marks omitted).  This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  *Hudson v. McMillian,* 503 U.S. 1, 6 (1992) (quotation marks omitted); *accord*, *Blyden*, 186 F.3d at 262.  The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases – not "whether a certain quantum of injury was sustained."  *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam).  Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness.  *Wilkins*, 559 U.S. at 37; *Hudson*, 503 U.S. at 9.

Additionally, courts must bear in mind that "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."  *Romano v. Howarth*, 998 F.2d

101, 105 (2d Cir. 1993) (quotation marks omitted); *see also Griffin*, 193 F.3d at 91.  "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  *Hudson*, 503 U.S. at 9-10 (quotation marks omitted).

"The objective component [of the excessive force analysis] . . . focuses on the harm done, in light of 'contemporary standards of decency.'"  *Wright*, 554 F.3d at 268 (quoting  *Hudson*, 503 U.S. at 8); *see also Blyden*, 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency'").  In assessing this component, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation.  *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *accord Hudson*, 503 U.S. at 8; *see also Wright*, 554 F.3d at 268.  "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated.  This is true whether or not significant injury is evident.'"  *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9) (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining

whether a prison official's use of force was "unnecessary and wanton" because "injury and force . . . are imperfectly correlated[.]" *Wilkins*, 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321; *Romano*, 998 F.2d at 105.

Given the fact-specific inquiry required to address the controlling objection and subjective elements, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim on a motion for summary judgment is inappropriate. *Wright*, 554 F.3d at 269 (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the . . . incident with [that officer] indicated only a slight injury")).

## 2. Preclusive Effect of the Hearing Officer's Determination

In their motion, building upon principles articulated by the Supreme

Court in *Heck v. Humphrey*, 512 U.S. 477 (1994), and *Edwards v. Balisok*,

520 U.S. 641 (1997), defendants argue that plaintiff is precluded from

asserting an excessive force claim against defendants in light of defendant

Ramey's findings at the disciplinary hearing that was conducted in connection

with the misbehavior report issued against plaintiff for the incident on June

18, 2008.  Dkt. No. 66-1 at 6-8.

In its decision in *Heck*, the Supreme Court held that a state prisoner's

claim for damages under 42 U.S.C. § 1983 is precluded if "a judgment in

favor of the plaintiff would necessarily imply the invalidity of his conviction or

sentence" absent proof that the inmate has already secured invalidation of

that conviction or sentence.  *Heck*, 512 U.S. at 487.  In 1997, the Supreme

Court issued its decision in *Balisok*, which, in essence, extended *Heck*.  The

Court in *Balisok* held that a plaintiff's claim for damages arising from

allegations of a violation of procedural due process in the context of a prison

disciplinary hearing is not cognizable under section 1983 where the nature of

the due process challenge necessarily implies the invalidity of the disciplinary

determination issued and/or punishment imposed, unless the disposition has

already been reversed through a state administrative or judicial habeas proceeding. *Balisok*, 520 U.S. at 645. These two cases, however, do not apply to all suits challenging prison disciplinary proceedings. *Mohammad v. Close*, 540 U.S. 749, 754 (2004).

Since the Court's decision in *Balisok* was rendered, the Second Circuit has interpreted *Balisok* and *Mohammed* to distinguish between those cases involving challenges to disciplinary penalties that only affect the conditions of an inmate's confinement – including disciplinary segregation such as keeplock and solitary confinement – and those resulting in the imposition of sanctions impacting upon an inmate's good-time credits. *Jenkins v. Haubert*, 179 F.3d 19, 22-23 (2d Cir. 1999). Applying *Balisok*, the Second Circuit concluded that a plaintiff challenging only the conditions of his confinement, where no good time credits have been lost as a result of the disciplinary hearing at issue, need not show as a threshold matter that the disciplinary hearing decision and sentence were reversed or invalidated. *Jenkins*, 179 F.3d at 27. Since the plaintiff in *Jenkins* was not attacking the fact or length of his confinement, either directly or indirectly, it was not necessary for him to invalidate the prison hearing officer's judgment against him prior to bringing a section 1983 claim for damages. *Id.*

Notwithstanding the rule announced in *Balisok* and carried over into the Supreme Court's later decision in *Mohammad*, the Second Circuit has clarified that if, as a prerequisite for maintaining his section 1983 action, a prisoner agrees to abandon, once and for all, the portion of his challenge directed to the duration of incarceration, then success in the section 1983 action will have no affect on the sanctions that relate to the length of time served in prison, and, accordingly, the inmate can proceed with his due process claim. *Peralta*, 467 F.3d at 105. Under *Peralta's* limited exception to the rule in *Balisok*, in order to pursue his section 1983 due process claim in this action, plaintiff must therefore abandon – not just at present, but for all time – any claims he may have with respect to the duration of his confinement that arise out of the proceeding now challenged. *Id.* at 104.

As was previously noted, the plaintiff in this case has submitted a *Peralta* waiver, Dkt. No. 13, and that waiver has been accepted by the court, resulting in dismissal of a portion of plaintiff's procedural due process claims that could be regarded as challenging the duration of his prison confinement, Dkt. No. 14. Defendants argue, however, that, notwithstanding plaintiff's *Peralta* waiver in this case, *Heck* and *Balisok* preclude him from litigating his excessive force claim because the disciplinary hearing related to the

misbehavior report issued against him with respect to the incident on June 18, 2008 resulted in a finding that defendants' use of force was precipitated by plaintiff's refusal to comply with an order and that he initiated the physical altercation. Dkt. No. 66-1 at 6-8. Stated differently, defendants argue that *Heck* and *Balisok* preclude plaintiff's excessive force claim because, in the event the court finds defendants used excessive force against plaintiff, such a finding would, *a fortiori*, invalidate the disciplinary conviction in light of the disciplinary hearing officer's specific findings. *Id.* Although novel, this argument ultimately fails.

The lynchpin inquiry in excessive force claims is whether the defendants utilized force against a plaintiff in a good faith effort to maintain or restore discipline, or instead was applied maliciously and sadistically for the very purpose of causing harm. *Hudson*, 503 U.S. at 6. It may well be, as the hearing officer found, that plaintiff initiated the confrontation at issue by shoving defendant Gille. That finding, as well as the other determinations rendered by the hearing officer, however, are not necessarily incompatible with a finding that defendants Gille, Blood, Nephew, and Russell reacted to Wynter's initial conduct by beating him out of malice, or with sadistic intentions. Similarly, the hearing officer did not consider plaintiff's allegations

in this case that defendants Bickford, Rocque, Porlier, and Beebe continued to assault him during the escort to the infirmary and/or at the infirmary. Complaint (Dkt. No. 1) at ¶ 43; Plf.'s Resp. (Dkt. No. 81-1) at 2.  Under these circumstances, neither *Heck/Balisok* nor the hearing officer's determination provides a basis to dismiss plaintiff's excessive force claims.

### 3.   Lack of Medical Evidence

In their motion, defendants also argue that plaintiff's excessive force claim is subject to dismissal because the medical records associated with the treatment administered by Great Meadow medical personnel do not support plaintiff's allegations concerning the extent of his injuries.  Dkt. No. 66-1 at 9-12.  This argument, however, fails to take into account the well-established principle that the absence of any serious injury from an alleged assault by prison personnel, while relevant, does not necessarily negate a finding that force has been applied wantonly and maliciously.  *Wilkins,* 559 U.S. at 37; *Hudson*, 503 U.S. at 9.  Said differently, the proper inquiry is not whether an inmate's injuries are *de minimis*, but whether the use of force is *de minimis*. *Id.*  Defendants' contention also overlooks the fact that plaintiff's medical records reveal that he did, in fact, suffer at least some degree of injury from the incident.  *See*, *e.g.*, Quackenbush Decl. Exh. A (Dkt. No. 67) at 78

(describing injuries to include abrasions on scapula and cheek, pain in lower jaw, back, wrist, and shoulder, and blood on lips though no lacerations detected).

Moreover, the cases cited by the defendants in support of their contention that the lack of medical evidence proving plaintiff's allegations regarding injuries entitles them to summary judgment are easily distinguished.  Three of the cases (*Graham v. Gibson*, No. 04-CV-6088, 2007 WL 3541613 (W.D.N.Y. Nov. 14, 2007); *Llorente v. Rozeff*, No. 99-CV-1799, 2001 WL 474261 (N.D.N.Y. Apr. 12, 2001) (Munson, J.); *Evans v. Bonner*, 196 F. Supp. 2d 252 (E.D.N.Y. 2002)), involve analysis of medical deliberate indifference claims, which are materially distinguishable from the excessive force cause of action at issue.  The last case cited by defendants, *Hansel v. Sheridan*, 991 F. Supp. 69, (N.D.N.Y. 1998), involves an excessive force claim, but is similarly inapplicable.  In that case, the court ordered dismissal of plaintiff's compensatory damage claim associated with alleged injuries based upon the failure to produce competent medical evidence to support his claims of injuries.  Although this case is clearly more analogous to the pending action than defendants' other cited cases, its applicability is limited based upon the fact that, here, there is medical evidence in the record to

support plaintiff's allegations of injuries. More specifically, defendant Alden's notes from her examination of plaintiff describe abrasions on plaintiff's scapula and cheek, slight swelling of the face, blood on plaintiff's lips, and plaintiff's complaints of pain in his lower jaw, back, wrist and shoulder. Quackenbush Decl. Exh. A (Dkt. No. 67) at 78. In addition, on June 19, 2008, the day after the incident, plaintiff was examined at the Albany Medical Center, where a radiology report reflected some soft tissue swelling in plaintiff's ankle area, as well as fractures to the foot, the age of which were "indeterminate." *Id.* at 45.

In sum, because the findings at the disciplinary hearing at Great Meadow do not preclude a finding that defendants used excessive force in this case, and because the record reveals that plaintiff did suffer some injury from the use of force, defendants' arguments with respect to this claim fail, and I therefore recommend that the portion of defendants' motion seeking dismissal on these grounds be denied.[5]

---

[5]     With respect to the failure to intervene claim asserted against defendant Cooney, because I have found no basis to dismiss plaintiff's excessive force claim, upon which the failure-to-intervene claim relies, and because defendants have not specifically moved for its dismissal, I have not addressed that specific claim, and recommend that it survive defendants' motion.

C.    Plaintiff's Deliberate Medical Indifference Claim

Plaintiff's complaint asserts an Eighth Amendment deliberate medical indifference claim against defendants Alden, Znipp, Dunning, Nesmith, as well as two nurses stationed at Great Meadow identified as "John Doe." Complaint (Dkt. No. 1) at ¶¶ 92-98.  In their motion, defendants request dismissal of that cause of action against defendants Nesmith and Alden,[6] arguing that the complaint fails to allege facts that plausibly suggest their personal involvement in the events giving rise to this action, and, in any event, no reasonable factfinder could conclude from the record evidence that either of them provided inadequate treatment to plaintiff.  Dkt. No. 66-1 at 12-15.

As explained above, the Eighth Amendment prohibits punishment that "involve[s] the unnecessary and wanton infliction of pain[.]"  *Estelle*, 429 U.S. at 102-03 (quotation marks omitted).  "Th[is] elementary principle[] establish[es] the government's obligation to provide medical care for those whom it is punishing by incarceration."  *Id.* at 103.  Failure to provide inmates with medical care, "[i]n the worst cases, . . . may actually produce physical

_____

[6]      As explained more completely below in part III.G. of this report, because defendants Znipp and Dunning have not been served with process, Dkt. Nos. 23, 24, they are not included in the pending motion.  Dkt. No. 66-1 at 3 n.1.

23

torture or lingering death, [and] . . . [i]n less serious cases, . . . may result in

pain and suffering no one suggests would serve any penological purpose."

*Id.*

Similar to excessive force claims, deliberate medical indifference claims

must satisfy both objective and subjective requirements. *Price v. Reilly*, 697

F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To satisfy the objective requirement,

the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively
> serious deprivation entails two inquiries. The first
> inquiry is whether the prisoner was actually deprived
> of adequate medical care. As the Supreme Court has
> noted, the prison official's duty is only to provide
> reasonable medical care . . . . Second, the objective
> test asks whether the inadequacy in medical care is
> sufficiently serious. This inquiry requires the court to
> examine how the offending conduct is inadequate and
> what harm, if any, the inadequacy has caused or will
> likely cause the prisoner.

*Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (citations omitted).

The second inquiry of the objective test requires a court to look at the

seriousness of the inmate's medical condition if the plaintiff alleges a

complete failure to provide treatment. *Smith v. Carpenter*, 316 F.3d 178,

185-86 (2d Cir. 2003). "Factors relevant to the seriousness of a medical

condition include whether 'a reasonable doctor or patient would find it

important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation marks and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith*, 316 F.3d at 185) (internal quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . ., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate

health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837); *see also Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., *adopting report and recommendation by* Homer, M.J.).[7] "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40).

The record now before court, which includes extensive records concerning plaintiff's medical treatment while in custody of the DOCCS, fails to give rise to a dispute of material fact as to whether defendants Alden and Nesmith acted with deliberate indifference to plaintiff's serious medical needs. Although the record evidence concerning the treatment provided to plaintiff by those defendants is limited, there is evidence that plaintiff was seen by defendant Alden on June 18, 2008, immediately following the incident with corrections officers. Alden Decl. (Dkt. No. 66-3) at ¶ 7; Quackenbush Exh. A (Dkt. No. 67) at 35, 77-79. Defendant Alden's medical

---

[7]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

notes demonstrate that she examined plaintiff before and after he removed his clothing down to his undershorts, and made several observations concerning his injuries and complaints of pain. Alden Decl. (Dkt. No. 66-3) at ¶¶ 8-13. On that occasion, defendant Alden offered plaintiff Tylenol for his complaints of pain, which he refused, but found that no other treatment was necessary at that time. *Id.* at ¶ 12. Defendant Alden had no further involvement with plaintiff's medical treatment. *Id.* at ¶ 14; *see also generally* Quackenbush Decl. Exh. A (Dkt. No. 67).

The record regarding defendant Nesmith's involvement in plaintiff's care with respect to the incident on June 18, 2008, is even more sparse. The only record evidence reflecting care administered by defendant Nesmith to plaintiff is that he authorized the radiological scans carried out at the Albany Medical Center on June 19, 2008. Quackenbush Decl. Exh. A (Dkt. No. 67) at 34, 44-46. Otherwise, there is no record evidence relating to this defendant. Notably, plaintiff's complaint also fails to include any specific allegations against defendant Nesmith. Complaint (Dkt. No. 1) at ¶¶ 92-98.

In summary, the evidence in this case, including the allegations in plaintiff's complaint, does not support a finding that either defendant Alden or Nesmith acted with the requisite mental state to satisfy an Eighth Amendment

deliberate indifference claim.  Nothing in the record suggests that defendant

Alden was aware of a serious medical condition and ignored it.  Instead, the

evidence shows that she was thorough in her examination of plaintiff on the

date of the incident, offered pain medication for his complaints, and found no

reason to provide further treatment based on her observations of minimal

abrasions and slight swelling.  With respect to defendant Nesmith, the record

reveals that, as a result of plaintiff's complaints of pain in his ankle, he sent

plaintiff to the Albany Medical Center to have x-rays taken on the day after

the incident with corrections officers, but that no significant injuries were

found.  The cumulation of all this evidence leads me to find that no

reasonable factfinder could conclude that defendants Alden and Nesmith

were deliberately indifferent to plaintiff's medical needs. Accordingly, I

recommend dismissal of plaintiff's deliberate indifference cause of action.

     D.    <u>Plaintiff's Procedural Due Process Claim</u>

Plaintiff's complaint asserts a procedural due process claim against

defendants Ramey and Bezio.  Complaint (Dkt. No. 1) at ¶¶ 66, 86.  In their

motion, defendants request dismissal of this claim, arguing that no

reasonable factfinder could conclude, based on the record evidence, that

defendants Ramey and Bezio violated plaintiff's rights.  Dkt. No. 66-1 at 15-

18.

To establish a procedural due process claim under section 1983, a plaintiff must show that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell*, 418 U.S. 539, 564-69 (1974). Under *Wolff*, the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-70; *see also Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1988). To pass muster under

the Fourteenth Amendment, a hearing officer's disciplinary determination must garner the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985).

In this instance, neither plaintiff's complaint nor his responsive papers in opposition to plaintiff's motion provide a clear indication as to how he was denied due process. *See generally* Complaint (Dkt. No. 1); Plf.'s Resp. (Dkt. No. 81-1). In any event, however, a careful review of the transcript from plaintiff's tier III hearing reveals no basis to conclude either that he was deprived of due process or that the hearing officer's determination was not supported by "some evidence." Indeed, plaintiff received notice of his hearing, he appeared and presented witnesses at the proceeding, and was provided an assistant in advance of the hearing to assist him in preparing his defense. Quackenbush Decl. Exh. B (Dkt. No. 66-6) at 2, 16, 25. In addition, although conflicting evidence was presented at the hearing regarding whether defendant Gille or plaintiff pushed the other first, certainly there is at least "some" evidence that plaintiff became boisterous after being told he would not receive the toilet paper he requested, and then shoved defendant Gille. *Id.* at 20, 29. Accordingly, I recommend dismissal of plaintiff's due process claim.

30

E.    Exhaustion of Remedies

Defendants construe plaintiff's complaint as asserting an Eighth Amendment conditions of his confinement claim arising from allegations related to his confinement in the facility SHU.  Dkt. No. 66-1 at 18.  The court, however, including Judge Hurd in his initial screening, does not interpret the complaint to assert such a claim.  Even liberally construing the pleading, I am unable to discern a basis for that claim.  Moreover, in the face of defendants' motion, in which they seek dismissal of plaintiff's conditions of confinement claim for failure to exhaust, plaintiff's response contains no argument related to this claim.  *See generally* Plf.'s Resp. (Dkt. No. 81).  For these reasons, I have not addressed defendant's exhaustion argument, and I recommend against interpreting plaintiff's complaint as asserting a conditions of confinement claim with respect to his SHU confinement.

F.    Qualified Immunity

Finally, in support of their motion for summary judgment, defendants argue that they are entitled to qualified immunity from suit with respect to any cause of action that otherwise survives their summary judgment motion.[8]

---

[8]    In light of my recommendation to dismiss plaintiff's Eighth Amendment medical indifference and Fourteenth Amendment due process claims, I have addressed qualified immunity only in the context of plaintiff's Eighth Amendment excessive force

(continued...)

Dkt. No. 66-1 at 18-21.

Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of New York*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223)).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson*,

_____

[8](...continued)
claim.

555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a constitutional right, and if so, "whether that right was 'clearly established' at the time of the events at issue." *Nagle v. Marron*, 663 F.3d 100, 114 (2d Cir. 2011) (citing *Saucier*, 533 U.S. at 194, 201, 202); *accord*, *Sira v. Morton*, 380 F.3d 57, 68-69 (2d Cir. 2004). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). However, "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007)

(citations omitted).  This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The parameters of the Eighth Amendment, particularly as they relate to the use of excessive force, have been well established for many years.  *See Green v. Montgomery*, 219 F.3d 52, 59 (2d Cir. 2000) ("It is beyond dispute that the right to be free from excessive force has long been clearly established.").  Accordingly, I am left to determine whether, under the circumstances of this case, it was objectively reasonable for defendants to believe that using force against plaintiff would not violate his Eighth Amendment rights.  Having carefully reviewed the record in this case, I find, at this juncture, that defendants are not entitled to qualified immunity. Assuming that plaintiff did, in fact, disobey a direct order and shove defendant Gille while standing outside the commissary, reasonable corrections officers could disagree over whether, in response, it would violate plaintiff's rights to punch him twice in the face, push him against a wall, and then have several other corrections officers use additional force to restrain him and/or escort him to the facility's infirmary.  Accordingly, I recommend that defendants' assertion that they are entitled to qualified immunity be

rejected.

G.    Plaintiff's Claims Asserted Against Defendants Dunning, Znipp, and John Does

Plaintiff's Eighth Amendment deliberate medical indifference claims asserted against defendants Dunning, Znipp, and two nurses at Great Meadow survived Judge Hurd's initial review of the complaint.  Dkt. No. 8 at 22.  With respect to defendants Dunning and Znipp, however, they were never served process.  Dkt. Nos. 23, 24, 46.

The federal rule governing service provides that,

> [i]f a defendant is not served within 120 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against that defendant or order that service be made within a specified time.  But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m).[9]  As the rule suggests, the period for service may be extended by the court.  "[W]here good cause is shown, the court has no choice but to extend the time for service, and the inquiry is ended." *Panaras v. Liquid Carbonic Indus. Corp.*, 94 F.3d 338, 340 (7th Cir. 1996). "If, however, good cause does not exist, the court may, in its discretion,

---

[9]    This court's local rules shorten the time for service from the 120-day period under Rule 4(m) to sixty days.  N.D.N.Y. L.R. 4.1(b).

either dismiss the action without prejudice or direct that service be effected within a specified time." *Panaras*, 94 F.3d at 340 (citing Fed. R. Civ. P. 4(m)); *see also Zapata v. City of New York*, 502 F.3d 192, 196 (2d Cir. 2007) ("We hold that district courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.*, 807 F.2d 309, 311 (2d Cir. 1986). When examining whether to extend the prescribed period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *Zapata*, 502 F.3d at 197.

In this case, because plaintiff has not yet had an opportunity to show good cause why defendants Dunning and Znipp have not been served within the time frames prescribed by the applicable rules, he is directed to show cause, in writing, within fourteen days of this report, why those defendants should not be dismissed from this case for failure to timely serve process. Plaintiff is advised that his failure to respond to this order could result in the automatic dismissal of those defendants.

With respect to the John Doe defendants, because plaintiff has failed to identify and serve those defendants, I recommend that they be

dismissed from the action.

IV.    <u>SUMMARY AND RECOMMENDATION</u>

Having reviewed the surviving claims in this action in the context of the arguments raised on defendants' summary judgment motion, I find that no reasonable factfinder could conclude that defendants were deliberately indifferent to plaintiff's serious medical needs, or that he was denied procedural due process. I further find, however, that plaintiff's excessive force claim cannot be determined on a motion for summary judgment, in view of the existence of disputed issues of fact that can only be resolved through trial. Similarly, I conclude that defendants are not at this juncture entitled to qualified immunity with regard to that claim. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 66) be GRANTED, in part, and that all of plaintiff's claims, including those asserted against the "Doe" defendants, be DISMISSED with the exception of his excessive force claim against defendants Gille, Blood, Nephew, Russell, Bickford, Rocque, Porlier, and Beebe, as well as a failure to intervene cause of action against defendant Cooney; and it is further hereby

ORDERED that plaintiff show cause, in writing, within fourteen days of service of this report, why his claims against defendants Dunning and Znipp should not be dismissed for failure to timely serve process in this case.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:      September 3,  2013
            Syracuse, New York


_____
David E. Peebles
U.S. Magistrate Judge



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

*1 Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681 *etseq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL 903629, at [*]1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,* 1998 WL 743710, at [*]1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at [*]1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

## BACKGROUND

*2 Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. [FN2] The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> FN3. Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> [FN4.] Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the respondeat superior principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional teasing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.AccordKotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. See *Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. See*Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' " are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at \*5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at \*6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. See*Davis,* 119 S.Ct. at 1671;*Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *AccordDavis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *SeeReese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7]*SeeReese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and

refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *seesupra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3541613 (W.D.N.Y.)

(Cite as: 2007 WL 3541613 (W.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

W.D. New York.
Harvey GRAHAM, Plaintiff,
v.
John GIBSON, Medical Dentist # 3, in his Individual
and Official Capacity, Defendant.
No. 04-CV-6088-CJS-MWP.

Nov. 14, 2007.
Harvey Graham, Ossining, NY, pro se.

Emil J. Bove, Jr., A.A.G., New York State Attorney
General's Office, Rochester, NY, for the defendant.

DECISION AND ORDER

CHARLES J. SIRAGUSA, District Court.
**INTRODUCTION**

**\*1** Siragusa, J. Plaintiff's civil rights complaint alleges
that the defendant, Dr. John Gibson, was deliberately
indifferent to his serious medical need, while Plaintiff was
an inmate of the Elmira Correctional Facility ("Elmira").
Plaintiff contends that Dr. Gibson removed, at Plaintiff's
request, a lower right wisdom tooth, but left the broken-off
root tips in his jaw to either heal, or surface on their own
for later removal. As a result, Plaintiff maintains he
suffered pain in violation of the Eighth Amendment
proscription against cruel and unusual punishment. Before
the Court are Dr. Graham's motion (Docket # 32) for
summary judgment, and Plaintiff's cross-motion (Docket
# 42), also seeking summary judgment. For the reasons
stated below, Dr. Graham's motion is granted, and
Plaintiff's cross-motion is denied.

**BACKGROUND**

Plaintiff filed his complaint pursuant to 42 U.S.C. §
1983 on March 4, 2004, alleging that Dr. Gibson violated
his Eighth Amendment rights by deliberate indifference to
his serious dental need, in connection with care he

provided in 2003 and 2004 at Elmira. In that regard,
Plaintiff claims that: pieces of one of his lower right
wisdom teeth broke off and remained in his gum during an
extraction Dr. Gibson performed on October 10, 2003, at
Elmira; Dr. Gibson refused to remove the pieces; and as a
result, he suffered unnecessary pain, swelling and
discomfort. Plaintiff also claims that, as a result, he
suffered a punctured left ear drum. In compliance with
Local Rule of Civil Procedure 56. 1, both parties have
filed statements of undisputed material facts. Pursuant to
those statements, the following facts are undisputed,
except where otherwise indicated.

Dr. Gibson is licensed by the State of New York as a
dentist and has practiced dentistry for over 28 years. He
was employed by the New York State Department of
Correctional Services ("DOCS") as a dentist at Elmira in
2003 and 2004 and remains so employed today.

When Dr. Gibson first examined Plaintiff on August
6, 2003. At this time, Plaintiff complained of pain on
biting and told Dr. Gibson that one of his wisdom teeth on
the lower right rear side of his mouth, identified as tooth
number 31, was sensitive to cold. Dr. Gibson examined
the tooth and observed questionable tenderness to
percussion, no swelling and no cavity. In Dr. Gibson's
opinion, tooth number 31 was a healthy tooth.
Consequently, Dr. Gibson recommended that the condition
of the tooth be observed for a few weeks, and he told
Plaintiff if his symptoms worsened or became acute, to
submit a slip for a call out. Dr. Gibson also told Plaintiff
that extracting the tooth was not a good choice. (Gibson
Decl. ¶ 4 Ex. A [FN1] to Gibson Decl. at 48-50.)

> FN1. Exhibit A to Dr. Gibson's declaration was
> filed manually per the Order of U.S. Magistrate
> Judge Marian Payson, since it contains medical
> information protected by the E-Government Act
> of 2002, Pub.L. No. 107-347 (Dec. 17, 2002).

On August 19, 2003, Plaintiff was seen by a dental
assistant at Elmira after he submitted a call out indicating
he wanted the tooth extracted. However, when he arrived
at the Elmira dental clinic, he refused the extraction and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3541613 (W.D.N.Y.)

(Cite as: 2007 WL 3541613 (W.D.N.Y.))

signed a refusal slip. (Gibson Decl. ¶ 4 Ex. A to Gibson Decl. at 47-48.) On October 10, 2003, plaintiff appeared at the dental clinic again and stated he desperately wanted the tooth extracted. Dr. Gibson explained the procedures, alternative treatments, risks, and possible complications to Plaintiff before the extraction, after which Plaintiff signed a consent form. When Dr. Gibson extracted the tooth, several small pieces of the tooth's root tips which were fused to his jaw bone broke off. (Gibson Decl. ¶ 5.) Since normally "retained" root tips heal in place and never cause a problem to the patient after healing, Dr. Gibson decided to not remove the pieces but rather to wait and see if they would heal. Dr. Gibson also concluded that removing the pieces at that time would have caused significant pain and trauma to Plaintiff's soft tissue and jaw because removal of root fragments requires the drilling of bone and prying. Moreover, Dr. Gibson believed that removal of the root tips would increase the likelihood of a painful condition called dry socket. (Gibson Decl. ¶ 5.) However, Dr. Gibson did not take x-rays of Plaintiff's mouth following the extraction Dr. Gibson advised Plaintiff he did not think the retained root tips would pose a problem, and prescribed antibiotics and fifteen Ibuprofen tablets (600 milligram each). (Def.'s Response to Pl.'s Statement of Facts, Docket No. 44, at 3-4 .) This approach was in accord with accepted dental practice in Elmira, New York at the time. (Gibson Decl. ¶ 5; Ex. A to Gibson Decl. at 46, 48.)

**\*2** When Dr. Gibson next saw Plaintiff on October 17, 2004, for a post-operative examination, the root tips had not surfaced. He smoothed out a sharp edge in the socket in the alveolar [FN2] area of Plaintiff's jaw bone from which the tooth had been removed and instructed Plaintiff to continue to use warm saline solution and Ibuprofen for his discomfort. (Gibson Decl. ¶ 7; Ex. A to Gibson Decl. at 45.) Dr. Gibson saw plaintiff again in the dental clinic on October 22, 2003, at which time plaintiff reported some improvement, and Dr. Gibson observed that gingival tissue [FN3] was beginning to grow over the root cavity. Dr. Gibson told Plaintiff that, at some point, the root tips should surface and then they could be removed with little trauma. (Gibson Decl. ¶ 8; Ex. A to Gibson Decl. at 45.)

FN2. "Of or pertaining to an alveolus (plural, alveoli), a small cavity or pit, as a socket for a

tooth." Mammal Glossary, Laboratory for Environmental Biology, University of Texas at El Paso (*available at* http:// www3.utep.edu/leb/keys/glossary.htm) (last viewed Oct. 25, 2007).

FN3. "The tissue surrounding the alveolar bone and teeth usually referred to as the gums." Glossary, The Dr. Samuel D. Harris National Museum of Dentistry (In association with the Smithsonian Institution) (*available at* http://www.dentalmuseum.umar yland.edu/school-tours/glossary/index.cfm) (last viewed Oct. 25, 2007).

When Dr. Gibson saw Plaintiff on October 29, 2003, the tissue had completely healed over the extraction area. However, Plaintiff complained about pain, which, according to Dr. Gibson, was inconsistent with the healing that had occurred. Plaintiff told Dr. Gibson that medical staff had prescribed Oxycontin, a synthetic opiod, at sick call, but Dr. Gibson indicated to plaintiff that 600 milligram tablets of Ibuprofen should be adequate. (Gibson Decl. ¶ 8; Ex. A to Gibson Decl. at 45.)

Complaining of pain in the extraction area, Plaintiff was seen on November 12, 2003, by Manesh Mewar, D.D.S. Dr. Mewar's examination indicated slight tenderness to touch. Plaintiff claimed he was on antibiotics, so Dr. Mewar called the pharmacy and checked plaintiff's Ambulatory Health Record. He found no prescription for antibiotics. Plaintiff stated he wanted the root tips removed by an oral surgeon. Dr. Mewar told him the root tips would be removed when they surfaced, and Dr. Mewar noted that Plaintiff was pushy and argumentative. Dr. Mewar gave Plaintiff a prescription for antibiotics and 600 milligram tablets of Ibuprofen. (Ex. A to Dawson Decl., Docket No. 35, at 44.)

Dr. Gibson's next contact with plaintiff was on November 25, 2003, at which time Plaintiff complained of pain when he was eating. Dr. Gibson noted that while the tissue had closed over the extraction site, there was some puffiness over the root tips. Plaintiff told Dr. Gibson he wanted to see an oral surgeon, but Dr. Gibson responded that Plaintiff should be able to get along until the tips

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3541613 (W.D.N.Y.)

(Cite as: 2007 WL 3541613 (W.D.N.Y.))

surfaced. Dr. Gibson then prescribed fifteen 600 milligram tablets of Ibuprofen that day, and again on December 4, 12, 18 and 29, 2003, and January 6 and 12, 2004. (Gibson Decl. ¶ 9; Ex. A to Gibson Decl. at 40, 43-44.)

Plaintiff wrote letters to Dr. Gibson, Elmira Nurse Administrator Mary Hopkins, and Elmira Deputy Superintendent Dana Aidala, dated October 23, 2003, November 3, 2003, November 25, 2003, and December 3, 2003, complaining about his condition and asking to be referred to an oral surgeon. Copies of Plaintiff's letters are attached Dr. Gibsons's Declaration as Exhibits C, D, E, and F. Plaintiff stated in a November 4, 2003, letter to Dr. Gibson that the ibuprofen provided only temporary relief of the pain, and after the medication wore off, the pain returned. (Ex. 3 to Graham Mem. of Law, Docket No. 42, at 13.)

**\*3** On December 12, 2003, Dr. Gibson advised plaintiff that on December 2, 2003, a referral had been made to an oral surgeon and that it had been approved on December 9, 2003, by William Dawson, D.D.S., DOCS' regional dental director for the Wende and Elmira Hubs. Dr. Gibson informed Plaintiff that the he was now on a waiting list for oral surgery. In the meantime, Dr. Gibson gave Plaintiff another prescription for Ibuprofen. (Gibson Decl. ¶ 11; Ex. A to Gibson Decl. at 42-43.) Subsequently on January 26, 2004, the root tips were extracted by Dr. O'Keefe [FN4] at Attica Correctional Facility. (Ex. A to Gibson Decl. at 41.) On January 27, 2004, and February 4, 2004, Dr. Gibson examined plaintiff and the area of the surgery had fully healed. (Gibson Decl. ¶ 12; Ex. A to Gibson Decl. at 40.)

    FN4. Dr. O'Keefe's full name does not appear in the documents submitted by the parties.

According to Dr. Dawson, Plaintiff's assertion that he suffered a punctured *left* ear drum as a result of the extraction of tooth number 31 on the lower *right* side of his mouth is not possible. Dr. Gibson noted that Plaintiff's medical record includes complaints of right and left ear pain and medical treatment on December 9 and 29, 2003, January 6, 2004, and June 6, 2004. Dr. Dawson asserts that there could be any number of causes of the perforated left ear drum, but in his opinion, Dr. Gibson's care of tooth

number 31 on the lower right side of Plaintiff's mouth was not one of them. (Dawson Decl. ¶ 7; Ex. A to Gibson Decl. at 10, 15, 27-31, 40, & 43-44.)

In an Order entered on September 27, 2005, the Court stayed the case on Dr. Gibson's attorney's application pursuant to the Servicemembers Civil Relief Act, 50 U.S.C. app. § 522(b) (2005). At Plaintiff's request, the Court reconsidered its Order staying the action and, in a Decision and Order dated November 15, 2006, affirmed the stay.

**STANDARDS OF LAW**

***Summary Judgment***

  The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *See Amaker v. Foley,* 274 F.3d 677 (2d Cir.2001); *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893 (3d Cir.1987) (*en banc* ). Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

  **\*4** Once that burden has been met, the burden then shifts to the non-moving party to demonstrate that, as to a material fact, a genuine issue exists. FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" only if the fact has some affect on the outcome of the suit. *Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3541613 (W.D.N.Y.)

(Cite as: 2007 WL 3541613 (W.D.N.Y.))

Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Leon v. Murphy,* 988 F.2d 303, 308 (2d Cir.1993); *Anderson,* 477 U.S. at 248-49; *Doe v. Dep't of Pub. Safety ex rel. Lee,* 271 F.3d 38, 47 (2d Cir.2001), *rev'd on other grounds Connecticut Dept. of Public Safety v. Doe,* 538 U.S. 1, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003); *International Raw Materials, Ltd. v. Stauffer Chemical Co.,* 898 F.2d 946 (3d Cir.1990). However, a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon a "metaphysical doubt" concerning the facts. *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Knight v. United States Fire Ins. Co.,* 804 F.2d 9 (2d Cir.1986). Rather, evidentiary proof in admissible form is required. Fed.R.Civ.P. 56(e). Furthermore, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections,* 84 F.3d 614, 619 (2d Cir.1996).

### Irby Notice

In their Notice of Motion, Defendants included the following language, pursuant to *Irby v. New York City Transit Authority,* 262 F.3d 412 (2001):

**PLEASE NOTE that pursuant to Rule 56(e) of the Federal Rules of Civil Procedure, when a motion for summary judgment is made and properly supported, you may not simply rely upon your complaint but you must respond, by affidavits or as otherwise provided in that rule, setting forth specific facts showing that there is a genuine issue of material fact for trial. Any factual assertions arising out of the exhibits attached to defendants' counsels affidavit**

**will be accepted by the District Judge as being true unless you submit affidavits or other documentary evidence contradicting those assertions. If you do not so respond, summary judgment, if appropriate, may be entered against you. If summary judgment is granted against you, your case will be dismissed and there will be no trial.**

**\*5 NOTE also that Local Rule 56 of the Western District of New York requires that you must include a separate short and concise statement of any material facts as to which you contend there exists a genuine issue. In the absence of such a statement, all material facts set forth in defendants' Rule 56 Statement will be deemed admitted.**

(Def.'s Notice of Motion at 1-2 (emphasis in original).)

### Deliberate Indifference to a Serious Medical Need

In this case Plaintiff is asserting an Eighth Amendment medical claim. The standard for such a claim is clear:

In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to his serious medical needs. This standard incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind.

Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation. [T]he Supreme Court [has] explained that the Eighth Amendment's prohibition on cruel and unusual punishments encompasses the deliberate failure to treat a prisoner's serious illness or injury resulting in the infliction of unnecessary pain and suffering. Because society does not expect that prisoners will have unqualified access to health care, a prisoner must first make this threshold showing of serious illness or injury in order to state an Eighth Amendment claim for denial

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3541613 (W.D.N.Y.)

(Cite as: 2007 WL 3541613 (W.D.N.Y.))

of medical care. Similarly, a prisoner must demonstrate more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability. An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety, a state of mind equivalent to the familiar standard of 'recklessness' as used in criminal law.

*Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (citations and internal quotations omitted). Courts have repeatedly held that disagreements over treatment do not rise to the level of a Constitutional violation. See, *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."). Similarly, negligence constituting medical malpractice, without more, will not establish a constitutional claim. *Id.* (citation omitted). As the Second Circuit also observed in Chance,

[a] cognizable claim regarding inadequate dental care, like one involving medical care, can be based on various factors, such as the pain suffered by the plaintiff, *see Fields v. Gander,* 734 F.2d 1313, 1314-15 (8th Cir.1984) ("severe pain" due to infected tooth), the deterioration of the teeth due to a lack of treatment, *see Boyd v. Knox,* 47 F.3d 966, 969 (8th Cir.1995) (three-week delay in dental treatment aggravated problem), or the inability to engage in normal activities, *Hunt v. Dental Dep't,* 865 F.2d 198, 200 (9th Cir.1989) (plaintiff complained that he was unable to eat properly); *cf. Dean v. Coughlin,* 623 F.Supp. 392, 404 (S.D.N.Y.1985) (holding that "dental needs-for fillings, crowns, and the like-are serious medical needs as the law defines that term"), *vacated on other grounds,* 804 F.2d 207 (2d Cir.1986).

**\*6** *Chance,* 143 F.3d at 703.

### ANALYSIS

***Plaintiff's Arguments***

Plaintiff's memorandum of law makes several arguments in support of his application for summary judgment. First, he states that Dr. Gibson,

decided not to make any further attempts in removing

the remaining broken pieces of root tips and thereof wanted to wait to see if they would hear or work their way out over time. But, however in the medicate [sic] instance of not knowing the actual out-come. Defendants [sic] fail to provide plaintiff with procedural security health x-ray process examination to secure the possibility of any over night unexpected inner bleeding defects.

(Pl.'s Mem. of Law at 4; further argument at 6.) In support of his argument that Dr. Gibson's failure to take x-rays was an Eight Amendment violation, Plaintiff cites to *Beyerback v. Sears,* 49 F.3d 1324 (8th Cir.1995). In that case, the Eighth Circuit reversed a district court decision denying the defense motion for summary judgment, writing that,

when the inmate alleges that the delay in treatment is the constitutional deprivation, the objective seriousness of the deprivation should also be measured "by reference to the *effect* of delay in treatment." *Hill,* 40 F.3d at 1188; *see also Wilson,* 501 U.S. at 303 (harmfulness of the deprivation to the prisoner is part of objective inquiry in an Eighth Amendment claim). "An inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed." *Hill,* 40 F.3d at 1188 (emphasis added). We recently recognized these principles in a case factually very similar to this case, concluding that an inmate failed to satisfy the objective component of the test because the inmate failed to submit "sufficient evidence that defendants ignored 'an acute or escalating situation' or that delays adversely affected his prognosis, given the type of injury in this case." *Sherrer v. Stephens,* 1994 U.S.App. LEXIS 33133, *2, No. 94-2248, 1995 WL 40419 (8th Cir. Nov. 23, 1994) (evidence insufficient where treatment for a broken finger was delayed, but ice, painkillers, and x-rays eventually given) (quoting *Givens v. Jones,* 900 F.2d 1229, 1233 (8th Cir.1990) (other citation omitted)).

*Beyerbach,* 49 F.3d at 1326. As was the case in Beyerbach, Plaintiff has not submitted verifying medical evidence to establish that Dr. Gibson's failure to take an x-ray resulted in a detrimental effect of delay in treatment.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3541613 (W.D.N.Y.)

(Cite as: 2007 WL 3541613 (W.D.N.Y.))

Plaintiff also contends that his

claim of deliberate indifference resulted from the intentional denial by defendant, John Gibson, for the necessary and serious Dental/Medical needs which was unnecessary, [sic] to have had to endured [sic] such infliction of easy to have been cured pain, which is prescribed [sic] by Eighth Amendment. *Bell v. County of Washington County Lowe S.D. Iowa,* 937 F.2d 1340, *Supra,* (1990); *Yarbaugh v. Roach,* 736 F.Supp. 318 (D.D.C.1990); *also see Barney v. Haverman,* 879 F.Supp. 775, 778 (W.D.Mich.1995); Gibson, Declaration paragraph 2, 3.

**\*7** (Pl.'s Mem. of Law at 4.) In *Bell v. Stigers,* 937 F.2d 1340 (8th Cir.1991), the Court of Appeals held that "[i]n a section 1983 action, mere negligence does not support a claim of deprivation of rights under either the Eighth Amendment, *Estelle,* 429 U.S. at 105-07, or the Fourteenth Amendment, *Davidson v. Cannon,* 474 U.S. 344, 348, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986)." *Bell,* 937 F.2d at 1345. The Eight Circuit reversed the district court's decision denying the defendants summary judgment and granted judgment to defendants. In the case at bar, Dr. Gibson has shown that at best this is a negligence case, if that. Accordingly, pursuant to the rule discussed in *Bell,* Plaintiff's claim is insufficient to support a judgment under § 1983 for deprivation of a constitutional right.

Plaintiff further contends that "Defendant failed to have completed the surgery without error ness [sic] after effects." (Pl .'s Mem. of Law at 5.) He cites in support: "*People v. Shafer,* 86 F.3d 90, (C.A.7 (Ill.) 1996). Gibson[']s statement of material facts paragraph 2 and 3, Gibson[']s Declaration paragraph-5." (*Id.*) The case reported at 86 F.3d 90 is actually *Pope v. Shafer,* in which the Seventh Circuit affirmed a jury verdict rendered against a corrections officer. However, the case involved, not a claim of deliberate indifference to a serious medical need, but, instead, a claim that prison officials failed in their "duty to take reasonable steps to insure the safety of inmates, including harm done by one inmate to another. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 1976-77, 128 L.Ed.2d 811 (1994)." *Pope,* 86 F.3d at

91-92. Thus, this case does not provide support for Plaintiff's Eighth Amendment claim. Further, Plaintiff's contention in this regard appears to the Court to be merely a claim of negligence, which, as stated above, is not a constitutional claim. Plaintiff also maintains s that he was not informed about the possibility that the root tips would remain in his jaw until after the surgery. (Pl.'s Mem. of Law at 5.) Dr. Gibson disputes this, but in any event, even if Plaintiff's version is true, his claim would amount again to one for medical malpractice and not a constitutional claim under § 1983.

Citing to *Hunt v. Dental Dep't.,* 865 F.2d 198 (9th Cir.1988), Plaintiff contends that the delay in removal of the root tips constitutes deliberate indifference. In *Hunt,* the Court of Appeals reversed a grant of summary judgment. In that case, the plaintiff prisoner lost his dentures during a prison riot and, despite requests for their replacement, he was not treated for nearly three months. In reversing a grant of summary judgment, the Ninth Circuit reasoned that the delay was more than an occurrence of neglect, and that it could be concluded that the delay was deliberate and that it caused plaintiff to suffer unnecessary infliction of pain. Here, however, there was no delay in treatment. To the contary, Dr. Gibson and Dr. Mewar continued to treat Plaintiff. The fact that Plaintiff disagreed with the treatment course chosen, does not amount to a denial of a type addressed in *Hunt.*

**\*8** With respect to his ear drum, Plaintiff contends that he can call an individual he identifies only as "Dr. Yim," who evidently relayed to Plaintiff "a speculated presumption." (Pl.'s Mem. of Law at 9.) He refers specifically to his November 26, 2003, letter to Nurse Administrator Hopkins, attached as Exhibit 8 to his memorandum of law, in which he states Dr. Yin informed him that he had a hole in his left ear. Also in that exhibit, are letters from Plaintiff dated August 4 and 13, 2003, in which he wrote that the pain he was experiencing was keeping him from sleeping. In what appears to be a second page of a letter to Nurse Administrator Hopkins, Plaintiff states that Dr. Yim has informed him that the root tips needed to be removed, and that Plaintiff was experiencing pain when eating, making it difficult to chew his food. (*Id.*) Federal Rule of Civil Procedure 56 requires the submission of evidentiary proof in admissible form.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3541613 (W.D.N.Y.)

(Cite as: 2007 WL 3541613 (W.D.N.Y.))

Plaintiff's recitation of Dr. Yim's speculation is not sufficient for this purpose.

### Defendant's Arguments

Dr. Gibson argues that the only basis for Plaintiff's complaint is a difference in opinion as to whether the broken-off root tips should have been removed sooner. He further argues that a difference of opinion between a plaintiff and a defendant "does not give rise to a constitutional right or sustain a claim under § 1983." (Def.'s Mem. of Law at 5-6.) In support, he relies on, *inter alia, Rodriguez v. Cheng Yin,* 328 F.Supp.2d 414, (W.D.N.Y.2004). In *Rodriguez,* the district court wrote that,

> [e]ven viewing the record in the light most favorable to plaintiff, and drawing all reasonable inferences in his favor, it is clear that this case presents no more than a disagreement between plaintiff and defendants over his medical condition and the best course of treatment for that condition. That does not amount to an Eighth Amendment violation.

*Rodriguez,* 328 F.Supp.2d at 416-17. As the Court pointed out above, a difference of opinion about how an inmate should be treated does not support to a constitutional claim under § 1983. *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998). Furthermore, DOCS medical staff continued to see and treat Plaintiff, on numerous occasions: October 17, 22 and 29, 2003; November 12 and 25, 2003. Dr. Gibson continued to write prescriptions for pain relievers. Finally, although later than Plaintiff would have liked, DOCS arranged for the surgical removal of the tips. The Court finds no material issue of fact and determines that the evidentiary proof in admissible form submitted in support of Dr. Gibson's motion demonstrates his entitlement to judgment as a matter of law.[FN5]

> FN5. In light of this disposition, the Court need not address Dr. Gibson's second argument in support of summary judgment, that the claims against Dr. Gibson in his official capacity are prohibited by sovereign immunity. *Employees of Dep't of Pub. Health and Welfare v. Dep't of Pub. Health and Welfare,* 411 U.S. 279, 280, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973).

### CONCLUSION

For the foregoing reasons, Dr. Graham's motion (Docket # 32) for summary judgment is granted and Plaintiff's cross-motion (Docket # 42), also seeking summary judgment, is denied. The Clerk is directed to enter judgment for Defendant. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith, and therefore denies leave to appeal in forma pauperis. Further requests to proceed on appeal *in forma pauperis* must be filed with the United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**\*9** IT IS SO ORDERED.

W.D.N.Y.,2007.

Graham v. Gibson
Not Reported in F.Supp.2d, 2007 WL 3541613 (W.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 474261 (N.D.N.Y.)

(Cite as: 2001 WL 474261 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dean B. LLORENTE, Plaintiff,
v.
Jonathan ROZEFF, Individually and as an agent, servant and/or employee and police officer of Amtrak, Wayne Peplowski, Individually and as an agent, servant and/or employee and police officer of the City of Rensselaer and City of Rensselaer Police Department, and the City of Rensselaer, Defendants,
No. 99-CV-1799.

April 12, 2001.

Tobin and Dempf, Albany, NY, for Plaintiff, Kevin A. Luibrand, of counsel.

Landam, Corsi, Ballaine & Ford, P.C., New York, New York, for Defendant Joseph Rozeff, Mark S. Landman, of counsel.

Ryan & Smallcombe, LLP, Albany, New York, for Defendants Wayne Peplowski and the City of Rensselaer, Claudia A. Ryan, of counsel.

MEMORANDUM DECISION AND ORDER

MUNSON, Senior J.

**\*1** On November 4, 1998, Assistant Conductor Gary Paugh had plaintiff put off an Amtrak train at the Rensselaer, N.Y. station for allegedly creating a disturbance. He was immediately arrested for disorderly conduct by defendant Wayne Peplowski, a City of Rensselaer police officer, and defendant Jonathan Rozoff, an Amtrak police officer, and taken, along with his luggage, to the Rensselaer Police Department. Plaintiff was placed on a bench in the booking area of the station, and his luggage was placed nearby. Defendant Rozoff was seated at the booking desk preparing a criminal information charging plaintiff with disorderly conduct. Defendant Poplowski was also present in the booking

area, but left briefly to obtain some required paperwork.

Plaintiff alleges that while he was seated in the booking area, an unidentified City of Rensselaer Police Officer started searching through his luggage, and when he stood up and to make an objection, the police officer struck him with an open hand hitting plaintiff on his left ear. Plaintiff fell to the floor stunned. He claims that defendants Rozeff and Peplowski then picked him up and dragged him to a jail cell where he passed out. He awoke the next morning with severe pain in his left ear and the blanket his head had rested upon saturated with blood. Plaintiff claims that he then cleaned himself up, had breakfast, was taken to court, pled guilty to the charge, paid the assessed fine and was released from custody. He went immediately to have his ear examined at the Albany Medical Center where he was diagnosed as having a perforated left ear drum, was treated with antibiotics, and was advised to obtain follow up medical attention. The court notes that the police guard on duty that morning makes no mention in the Renesselaer Police Department Prisoner Log of seeing a blood drenched blanket in plaintiff's cell when he awakened plaintiff and provided him with breakfast. (Luibrand-Affidavit in Partial Opposition to Defendants' Motions for Summary Judgment, Ex. H)

Plaintiff commenced this action on November 23, 1999, asserting that because defendants Rozeff and Peplowski denied him his constitutional right to medical treatment in violation of 42 U.S.C. § 1983, he suffered permanent damage to his left ear, including extreme pain and ringing in his ear as well as mental suffering. The complaint also contains a pendent state claim for assault and battery. Plaintiff seeks compensatory and punitive damages, attorney's fees and costs.

On April 28, 2000, plaintiff's motion to amend the complaint to add Amtrak as a party defendant and asserting causes of action of conspiracy to violate 42 U.S.C. § 1985, negligence and respondeat superior was granted, however, the record does not show that an amended complaint was ever served on Amtrak.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 474261 (N.D.N.Y.)

(Cite as: 2001 WL 474261 (N.D.N.Y.))

Currently before the court are individual motions for summary judgment, one made by defendant Rozeff, and the other by defendants Peplowski and the City of Rensselaer for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff has entered partial opposition to each of these motions.

DISCUSSION

**\*2** Rule 56 of the Federal Rules of Civil Procedure permits summary judgment where the evidence demonstrates that "there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2709, 91 L.Ed.2d 202 (1986). Summary judgment is properly regarded as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (quoting Federal Rule of Civil Procedure 1). In determining whether there is a genuine issue of material fact a court must resolve all ambiguities and draw inferences against the moving party. *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)(*per curiam* ). An issue of credibility is insufficient to preclude the granting of a motion for summary judgment. Neither side can rely on conclusory allegations or statements in affidavits. The disputed issue of fact must be supported by evidence that would allow a "rational trier of fact to find for the non-moving party." *Mashusita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Unsupported allegations will not suffice to create a triable issue of fact. *Goenga v. March of Dimes Birth Defects Federation,* 51 F.3d 14, 18 (2d Cir.1995). Nor will factual disputes that are irrelevant to the disposition of the suit under governing law preclude any entry of summary judgment. *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509.

The papers submitted by plaintiff in opposition to the two summary judgment motions address only that portion of his first cause of action that claims that defendants Peplowski and Rozeff denied him medical attention in an unconstitutional manner. Plaintiff did not challenge the contentions made by defendants Peplowski and Rozeff in

their motion papers that plaintiff's claims in his first cause of action regarding defendant Rozeff's striking the plaintiff, and defendant Peplowski's failure to intervene to stop this assault, are without merit, as is the state law assault and battery claim he sets forth in his second cause of action. The court agrees with the defendants' positions here and will dismiss these causes of action. The only remaining claim for the court to consider in these summary judgment motions is that defendants Peplowski and Rozeff did not provide medical treatment to plaintiff for his injured ear.

Although plaintiff does not so state in his complaint, what he is claiming is that defendants Roseff and Peplowski were deliberately indifferent to his serious medical needs. The Eighth Amendment's prohibition on cruel and unusual punishment proscribes "deliberate indifference to serious medical needs manifested by ... intentionally delaying access to medical care. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Eighth Amendment does not apply in cases where there has been no formal adjudication of guilt. *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983). The rights of one who has not been convicted are protected by the Due Process Clause and ... it is plain that the unconvicted detainee's rights are at least as great as those of the convicted prisoner. *Weyant v. Osk,* 101 F.3d 845, 856 (2d Cir.1996). Therefore, the deliberate indifference claims apply arise under the Due Process Clause of either the Fourteenth Amendment or the Fifth Amendment. *Cuoco v. Mortisgugu,* 222 F.2d 99, 106 (2d Cir.2000).

**\*3** Here, plaintiff was under arrest and in custody at the time of the alleged delay of medical attention, and had not been arraigned or convicted of any crime. He was neither a pre-trial detainee nor a prisoner, but an arrestee in custody. Even though the Supreme Court has not formulated the duties of the custodial official under the Due Process Clause to provide medical care to arrestees, it is clear that the arrestee's rights are as great as those afforded to the pre-trial detainee and to a convicted prisoner under the Eighth Amendment. Hence, plaintiff's denial of medical care claim will be analyzed under Eighth Amendment case law. *Smith v. Montefiore Medical Center-Health Services Division,* 22 F.Supp.2d 275, 280

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 474261 (N.D.N.Y.)

(Cite as: 2001 WL 474261 (N.D.N.Y.))

(S .D.N.Y.1998).

"The deliberate indifference standard is comprised of an objective and subjective prong. First the alleged deprivation must be, in objective terms, 'sufficiently serious' [and][s]econd, the charged official must act with sufficiently culpable state of mind. *Hathaway v. Coughlin,* 37 F.2d 63, 66 (2d Cir.1994). For the first prong, a sufficiently serious medical need "contemplates a condition urgency, one that may produce death, degeneration, or extreme pain." *Id.* To meet the second prong, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct., 128 L.Ed.2d 811 (1994). The subjective element of deliberate indifference "entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result ." *Id., at 835.*

Here, plaintiff's evidence does not support a claim of deliberate indifference against either defendant Rozeff or defendant Peplowski. First, assuming that plaintiff had a sufficiently serious medical need, plaintiff has not shown that either defendants' state of mind was deliberate indifference as formulated in *Farmer v. Brennan, Id.* Plaintiff does not call attention to evidence to support that either defendant knew the facts from which he could draw that inference. *Id.* at 837. He only speculates that either or both defendants may have seen him struck by the unidentified police officer because they both were entering and leaving the booking room throughout the period he was being detained there. Furthermore, plaintiff offers no evidence that his need for medical attention was evident. At the Albany Medical Center he was diagnosed as having a perforated left ear drum, treated with antibiotics, and advised to obtain follow up medical evaluation. Plaintiff's alleged injury was internal. There is no evidence in plaintiff's's testimony or any document from which it can be inferred that plaintiff had suffered a serious injury obvious to either of the defendants. "It is impossible to respond to invisible injury without notice." *Owens v. Colburn,* 860 F.Supp. 996, 974-75 (N.D.N.Y.1994). Plaintiff has not presented any evidence that either defendant would have known that plaintiff needed medical

attention just by looking at him.

**\*4** The record also indicates that plaintiff's medical problem may have pre-existed his being struck on the left outer ear by an unidentified police officer. On February 14, 2000, plaintiff had his left ear examined by a Doctor Qec, at The Queen Emma Clinics in Hawaii. Dr. Qec's examination report states that plaintiff said "in November 1998, he injured his ear while diving into a pool." Plaintiff's left ear was again examined at an ENT clinic in the same medical facility on February 23, 2000, by Meredith K.L. Pang, M.D. Dr. Pang's examination report states that plaintiff said the ear was injured in Colorado "while playing basketball 16 months ago." (Def, Peplowski's Notice of Motion, Ex. L).

In paragraph 20 of his complaint plaintiff maintains that he asked for medical treatment after he had been struck on the ear. The record disagrees with this assertion. Plaintiff has admitted as part of his opposition papers that at no point did he either cry out or express pain or or request medical assistance from any member of the City of Rensselaer Police Department, the officer who woke him in the morning and escorted him to court, nor the presiding judge of the court. Plaintiff first complained of his injury at the Albany Medical Center. He has put forward no evidence that defendants Rozeff and Peplowski would have known that he needed medical attention just by looking at him thereby failing to demonstrate that defendants had the requisite state of mind under *Farmer v. Brennan* to show deliberate indifference to plaintiff's medical needs.

Plaintiff also alleges that the defendants conduct in delaying him medical assistance caused him permanent injury. (Complaint ¶ 24). A delay in providing medical care to an arrestee does not by itself violate the constitution. *Shockly v. Jones,* 823 F.2d 1068, 1072 (7 th Cir.1987). To establish a constitutional violation, an arrestee must show that he suffered substantial harm as a result of the delay in receiving medical care. *de La Paz v. Danzel,* 646 F.Supp. 914, 922-23 (D.C.N.D.Ill.1986). A plaintiff who complains that a "delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Hill v. DeKalb*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 474261 (N.D.N.Y.)

(Cite as: 2001 WL 474261 (N.D.N.Y.))

*Regional Youth Detention Center,* 40 F.3d 1176, 1188 (11th Cir.1994). Not only has plaintiff not done this, he acknowledges that he has not identified any expert who will testify that his injury was aggravated as a result of the claimed delay in medical treatment, (Plnf.7.1(a)(3) Respn to Peplowski ¶ 36), and admits that no medical records exist which supports that a delay in medical care resulted in aggravation of his injury. (*Id.* at ¶ 37)

The evidence submitted does not support plaintiff's claim that defendants Rozeff and Peplowski exhibited deliberate indifference to plaintiff's medical needs, and these defendants are entitled to summary judgment on plaintiff's claim of deliberate medical indifference to his medical needs. What is more, because plaintiff has not established any legally cognizable federal claim against municipal police officer defendant Pepolski, no claim can lie against municipal defendant The City of Rensselaer. *City of Los Angles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986)

**5** Defendants Rozeff and Peplowski have both set forth affirmative defenses of qualified immunity. In an action brought under 42 U.S.C. § 1983, a plaintiff must establish that a person acting under color of state law deprived him of a federal right. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, L. 64 Ed.2d 572 (1980). If a plaintiff fails to set forth facts sufficient to meet these elements, as has occurred in the instant case, the court need not consider whether a defendant is entitled to qualified immunity. *Calhoun v. New York State Division of Parole Officers,* 999 F.2d 647, 652 (2d Cir.1993).

Accordingly, the two motions for summary judgment made by defendants Rozeff and Peplowski and the City of Rensselaer are GRANTED and the complaint is DISMISSED.

IT IS SO ORDERED

N.D.N.Y.,2001.

Llorente v. Rozeff
Not Reported in F.Supp.2d, 2001 WL 474261 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
No. 97-CV-1385 LEK DRH.

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989);  28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.